# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## STATESBORO DIVISION

SHANNON LABRANCE HORNE,

        Plaintiff,

    v.

GARRETT NEVIL; KAYE DRIGGERS; and
JOHN STATEN,

        Defendants.

CIVIL ACTION NO.: 6:15-cv-44

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Presently before the Court are Defendants' Motions to Dismiss, or in the Alternative, Motions for Summary Judgment.[1] (Docs. 34, 36.) For the reasons and in the manner set forth below, I **RECOMMEND** that the Court **DENY** Defendants' Motions to Dismiss. In addition, I **RECOMMEND** that the Court **GRANT IN PART** and **DENY IN PART** Defendants' Nevil and Staten's Motion for Summary Judgment, (doc. 34). The Court should **GRANT** the Motion for Summary Judgment as to Defendant Nevil but **DENY** the portion of the Motion as to Defendant Staten. Furthermore, I **RECOMMEND** that the Court **GRANT** Defendant Driggers' Motion for Summary Judgment. (Doc. 36.) Finally, I **RECOMMEND** that the Court **DENY** Plaintiff leave to appeal *in forma pauperis* the Court's decision as to Defendant Driggers' and Defendant Nevil's Motions for Summary Judgment.

---

[1] In its Order dated December 15, 2016, the Court recast Defendants' Motions for Summary Judgment as Motions to Dismiss because the parties specifically addressed the issue of exhaustion. (Doc. 47.) However, Defendants also included separate summary judgment arguments. Accordingly, the Court construes Defendants' Motions as Motions to Dismiss, or in the Alternative, Motions for Summary Judgment.

# BACKGROUND[2]

Plaintiff, an inmate at Phillips State Prison in Buford, Georgia, filed this cause of action pursuant to 42 U.S.C. § 1983 alleging that Defendants were deliberately indifferent to his serious medical needs while he was housed at Bulloch County Jail (or "the Jail"). (Doc. 1.) Plaintiff filed this cause of action against Defendant Staten, sheriff of Bulloch County Jail, Defendant Nevil, Chairman of the Board of Bulloch County Commissioners, and Defendant Driggers, a nurse at the Jail. In his Complaint, Plaintiff, diagnosed with Human Immunodeficiency Virus ("HIV"), alleges that Defendants were deliberately indifferent to his medical needs when they refused to provide him with antiviral medication for approximately 25 days. (Id.) On January 6, 2015, Plaintiff was transferred from Calhoun State Prison to Bulloch County Jail to answer pending criminal charges. (Id. at p 5.) Plaintiff states that, in addition to an intake evaluation noting his condition, nurses from Calhoun State Prison forwarded documents explaining Plaintiff's medical and dietary needs. (Id.) Plaintiff arrived at the Bulloch County Jail with enough antiviral medication to last approximately one month. (Id.) After he ran out of medication, Plaintiff filed three grievances asking for a refill. (Id. at p. 4.) In response, Nurse Mock told Plaintiff that his medication could not be reordered because it was expensive, and medical "had to get approval through Captain Staten and . . . the county is not going to approve this." (Id. at p. 5.) Plaintiff alleges that staff at the Bulloch County Jail continued to deny him a refill for the rest of his stay there. As a result, Plaintiff alleges that his viral load increased, and he "started feeling bad and getting sick." (Id. at p. 6.)

On August 4, 2016, Defendants Nevil and Staten filed a joint Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, and Defendant Driggers separately filed a Motion

---

[2] The recited allegations are taken from Plaintiff's Complaint and are viewed in the light most favorable to Plaintiff, the non-moving party. Johnson v. Booker T. Washington Broad Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

to Dismiss, or in the Alternative, Motion for Summary Judgment. (Docs. 34, 36.) Plaintiff filed a Response to both Motions on August 30, 2016. (Doc. 42.) On December 15, 2016, the Court directed the parties to provide supplemental information regarding Plaintiff's exhaustion of available administrative remedies, including the administrative remedies and procedures available at Bulloch County Jail. (Doc. 47.) Defendant Driggers filed a supplemental memorandum on December 29, 2016, and Defendants Nevil and Staten filed a supplement on January 5, 2017. (Docs. 48, 49.) Plaintiff filed a Response, (doc. 50), and Defendants filed Replies, (docs. 52, 54).[3]

## DISCUSSION

I.  **Defendants' Motion to Dismiss for Plaintiff's Failure to Exhaust Bulloch County Jail's Available Administrative Remedies Before Filing Suit**

A.  **Standard of Review**

The determination of whether an inmate exhausted his available administrative remedies prior to filing a cause of action in federal court is a matter of abatement and should be raised in a motion to dismiss. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008). "Because exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense . . . is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." Id. at 1374–75 (internal citation omitted). "Even though a failure-to-exhaust defense is non-jurisdictional, it is like" a jurisdictional defense because such a determination "ordinarily does not deal with the merits" of a particular cause of action. Id. at 1374 (internal punctuation and citation omitted). Further, a judge "may resolve factual

---

[3] Defendants Nevil and Staten also filed a Surreply to a Response Plaintiff allegedly made on February 9, 2017. (Doc. 56) However, Plaintiff's Response was not filed with the Court, and thus, the Court will disregard Plaintiff's alleged Response and Defendants' Nevil and Staten's February 16, 2017, Surreply.

questions" in instances where exhaustion of administrative remedies is a defense before the court. Id. In these instances, "it is proper for a judge to consider facts outside of the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." Id. at 1376.

In Turner v. Burnside, 541 F.3d 1079 (11th Cir. 2008), the Eleventh Circuit Court of Appeals set forth a "two-step process" that lower courts must employ when examining the issue of exhaustion of administrative remedies. First, the court is to take the plaintiff's version of the facts regarding exhaustion as true. Id. at 1082. If, even under the plaintiff's version of the facts, the plaintiff has not exhausted, the complaint must be dismissed. Id. However, if the parties' conflicting facts leave a dispute as to whether plaintiff has exhausted, the court need not accept all of plaintiff's facts as true. Id. Rather, "the court then proceeds to make specific findings in order to resolve the disputed factual issues[.]" Id. "Once the court makes findings on the disputed issues of fact, it then decides whether under those findings the prisoner has exhausted his available administrative remedies." Id. at 1083. The Eleventh Circuit has held that a district court may consider materials outside of the pleadings and resolve factual disputes regarding exhaustion in conjunction with a Rule 12(b)(6) motion to dismiss so long as the factual disputes do not decide the merits of the case. See Bryant, 530 F.3d at 1376–77.

Additionally, the United States Supreme Court has "held that the PLRA's [Prison Litigation Reform Act's] text suggests no limits on an inmate's obligation to exhaust— irrespective of any 'special circumstances.' And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account." Ross v. Blake, ___ U.S. ___, 136 S. Ct. 1850, 1856 (June 6, 2016). However, the Supreme Court reiterated that a

prisoner need only exhaust those remedies which were available to him.  Id. at 1858 ("An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.").

### B.      Legal Requirements for Exhaustion

Where Congress explicitly mandates, prisoners seeking relief for alleged constitutional violations must first exhaust inmate grievance procedures before filing suit in federal court.  See Porter v. Nussle, 534 U.S. 516, 524 (2002).  Section 1997e(a) of Title 42 of the United States Code states, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law . . . until such administrative remedies as are available are exhausted."   In Porter, the Supreme Court held that exhaustion of available administrative remedies is mandatory.  Porter, 534 U.S. at 523; see also O'Brien v. United States, 137 F. App'x 295, 301–02 (11th Cir. 2005) (finding lack of exhaustion where prisoner "prematurely filed his civil complaint . . . and . . . 'failed to heed that clear statutory command' requiring that his administrative remedies be exhausted before bringing suit").

The requirement that the exhaustion of remedies occur "first in an agency setting allows 'the agency [to] develop the necessary factual background upon which decisions should be based' and giv[es] 'the agency a chance to discover and correct its own errors.'"  Green v. Sec'y for Dep't of Corr., 212 F. App'x 869, 871 (11th Cir. 2006) (quoting Alexander v. Hawk, 159 F.3d 1321, 1327 (11th Cir. 1998) (first alteration in original)).   Furthermore, requiring exhaustion in the prison setting "eliminate[s] unwarranted federal-court interference with the administration of prisons" and allows "corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  Woodford v. Ngo, 548 U.S. 81, 93 (2006).

The Supreme Court has noted exhaustion must be "proper." Id. at 92. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 90–91. In other words, an institution's requirements define what is considered exhaustion. Jones v. Bock, 549 U.S. 199, 218 (2007).

Thus, under the law, prisoners must do more than simply initiate grievances; they must also appeal any denial of relief through all levels of review that comprise the administrative grievance process. Bryant, 530 F.3d at1378 ("To exhaust administrative remedies in accordance with the PLRA, prisoners must 'properly take each step within the administrative process.'") (quoting Johnson v. Meadows, 418 F.3d 1152, 1157 (11th Cir. 2005)); Sewell v. Ramsey, No. CV406-159, 2007 WL 201269 (S.D. Ga. Jan. 27, 2007) (finding that a plaintiff who is still awaiting a response from the warden regarding his grievance is still in the process of exhausting his administrative remedies).

Furthermore, an inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA. Johnson, 418 F.3d at 1157–59; Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000) (inmate's belief that administrative procedures are futile or needless does not excuse the exhaustion requirement). Additionally, "[t]he only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint." Smith v. Terry, 491 F. App'x 81, 83 (11th Cir. 2012).

"However, 'while [Section] 1997e(a) requires that a prisoner provide as much relevant information as he reasonably can in the administrative grievance process, it does not require more.'" Id. (quoting Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000)). The purpose of

Section 1997e(a) is not that "fact-intensive litigation" result over whether every fact relevant to the cause of action was included in the grievance.  Hooks v. Rich, CV605-65, 2006 WL 565909, at *5 (S.D. Ga. Mar. 7, 2006) (internal citation omitted).  "'As long as the basic purposes of exhaustion are fulfilled, there does not appear to be any reason to require a prisoner plaintiff to present fully developed legal and factual claims at the administrative level.'"  Id. (quoting Irvin v. Zamora, 161 F. Supp. 2d 1125, 1135 (S.D. Cal. 2001)).  Rather, Section 1997e(a) is intended to force inmates to give authorities a chance to correct constitutional violations before resorting to federal suit and to prevent patently frivolous lawsuits.  Id.

### C. Bulloch County Jail's Grievance Procedure

Through several affidavits, Defendant Staten asserts that Jail inmates may file grievances through a kiosk located within the Jail dormitory.  (Docs. 34-1, 49.)  When inmates are first detained at Bulloch County Jail, they are provided an individual, personal identification number to access the kiosk, as well as an explanation on how and for what purpose the kiosk is used. (Doc. 49, pp. 1–2.)  Inmates may use the kiosk to communicate with Jail officers and submit grievances and other requests for Jail personnel, including requests for information, daily necessities, and medical services.  Relevantly, this kiosk contains information regarding the grievance and appeal procedure.  (Doc. 34-1, p. 15.)  After submitting a grievance through the kiosk, decisions are rendered and conveyed to the inmates via the kiosk within three to five days. (Id.)  According to Defendant Staten, inmates may appeal any adverse decision within 72 hours through the same kiosk.  (Id.)

Defendants provide a copy of the Inmate Handbook, which is provided to each inmate upon entry to the Jail.  (Doc. 49, pp. 19–20.)  The Handbook provides instructions for a paper grievance process.  Inmates are directed to fill out an inmate grievance form, which "may take a

week or longer to be processed." (Id. at p. 19.)  These forms may be obtained from and returned to any "mail persons" or officer.  (Id.)  However, the Handbook does not mention any appeal process.  (Id.)

**D.  Whether Bulloch County Jail's Administrative Remedies were Available to Plaintiff**

There is no dispute that Plaintiff filed initial grievances regarding the refusal of his medication.  Indeed, Defendants attach numerous requests that Plaintiff submitted through the kiosk system where he complained about his medical issues and requested medication to treat his HIV.  (Doc. 49, pp. 22–27 ("I AM WRITING IN REGARD OF SOME MEDICINE THAT I REALLY NEED.  THE MEDICINE IS ATRIPLA AND ITS [sic] FOR HIV AND I HAVE BEEN OUT FOR 17 DAYS NOW.  I HAV[E] WRITTEN TWO PREVIOUS GREIVANCES [sic] ABOUT THIS MATTER.  I WAS TOLD BY OPR TO WRITE MEDICAL ABOUT ANY QUESTIONS I HAVE. . . .").)  However, Defendants contend that Plaintiff failed to appeal the denial of these grievances.  Plaintiff concedes that he did not file an appeal.  Ordinarily, this concession would be dispositive as Plaintiff was required to exhaust each step of the Jail's grievance procedure.  Bryant, 530 F.3d at 1378.  However, Plaintiff was only required to exhaust those steps of the process which were actually available to him.  Despite this Court's request for additional information, (doc. 47, pp. 4–5), Defendants have failed to show that the Jail's purported appeal process was available to Plaintiff.

Though the Supreme Court rejected a "special circumstances" exception to exhaustion in Ross, it reiterated that a prisoner need only exhaust those remedies which were available to him. ___ U.S. at ___, 136 S. Ct. at 1858 ("An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.").  The Court recognized "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain

relief." Id. at 1859. First, the Court stated that, in some instances, the administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. Thus, if the administrative procedure lacks authority or if the officials with apparent authority "decline ever to exercise it," the inmate has no obligation to exhaust the remedy. Id. Second, when administrative remedies are so confusing that they are "essentially 'unknowable,'" exhaustion is not required. Id. at 1859–60 (citing Goebert v. Lee Cty., 510 F.3d 1312, 1323 (11th Cir. 2007), and Turner, 541 F.3d at 1084). Lastly, exhaustion is not required "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860. However, the Supreme Court recognized that, "[g]iven prisons' own incentives to maintain functioning remedial processes, we expect that these circumstances will not often arise." Id. at 1859.

Plaintiff contends that the jail had no appeal process, and further, that if such a process was in place, Jail officials never notified him of that process. (Doc. 50.) Thus, under the first Turner step, the appeal process was not actually available to Plaintiff. However, the Court must subject Plaintiff's claims of unavailability to the more stringent review required by the second Turner step. Even proceeding under that standard, the current record reflects that the appeal process was not available to Plaintiff.

As an initial matter, Defendants have failed to provide sufficient evidence that the appeal process is even "officially on the books" at the Jail. The Inmate Handbook does not mention any appeal process. (Doc. 49, p. 19.) Moreover, Defendant Staten indicates in his affidavit that medical issues will not be handled through the normal grievance process, (doc. 49, p. 11), but this qualification is completely absent from the Handbook. Defendant Staten states that if an inmate submits a medical question through a "non-medical grievance type", he will be advised to

submit "all grievances, requests, and questions to medical personnel."[4]  (Id.)  However, this entirely contradicts Defendant Staten's description of the appeal process which is handled by Shift Lieutenants, Sergeants, and, ultimately, the Jail Captain.  (Id. at p. 12.)

Moreover, Plaintiff states in his Response to Defendants' Supplemental Memoranda that the kiosk "did not have a selection labeled grievance."  (Doc. 50, p. 2.)  Instead, Plaintiff had to specifically type "grievance" into his kiosk submissions.  Thus, Defendant Staten's affidavit only serves to highlight the lack of a formal grievance procedure within the Jail.  Defendant Staten attests that, "the inmate may select from a number of different grievance types" after logging into the kiosk.  (Doc. 49, p. 11.)  However, immediately preceding this attestation, he states that these kiosks are used to submit requests, grievances, questions, and are generally a point of contact between the inmates and Jail officials.  Thus, it appears that these "grievance type" categories are used indiscriminately for "grievances, requests, and questions."  (Id. at p. 11.)  For example, regardless of whether an inmate has a medical question, request, or grievance, he simply selects "medical" from the drop down menu.  In fact, every submission is actually titled a "request," and the report provided to the Court is entitled a "Resident Request Report."  (Id. at pp. 12, 22–27; Doc. 42-3, pp.15–19.)  As a result, unless a prisoner specifically types "grievance" into his request, as Plaintiff did in this instance, it appears that the Jail has no way of determining whether a submission is a formal grievance or simply a request.  This confusion regarding how to file an initial grievance only exacerbates the confusion surrounding whether an inmate is required to file an appeal of a grievance and, if so, how he may do so.

---

[4]  This notification does not appear to be provided on every occasion though.  Plaintiff submitted a "medical" type request on February 9, 2015 and categorized it as "MISC."  (Doc. 42, p. 31.)  Jail personnel did not provide a response.

Even if the appeal process was "on the books," it does not appear from the current record that Plaintiff was ever made aware of that process. Tellingly, in his affidavits, Defendant Staten never states that jail officials affirmatively notify inmates of the appeal process. Rather, he states that "[i]nformation concerning the appeal of grievances is available on the Kiosks." (Doc. 49, p. 11; see also, doc. 34-1, p. 15 ("Inmates at the jail are provided with information concerning the grievance and appeal procedure at kiosks located within the dormitories at the jail.").) Thus, it appears that inmates can search for information on filing an appeal on the kiosk. Of course, inmates would not know to search for such information, if they did not first know of the option to file an appeal. Nothing in the record indicates that Plaintiff knew of this option. To the contrary, as already mentioned above, the only information that Jail officers affirmatively provide to inmates, the Inmate Handbook, makes no mention of an appeal. Moreover, the responses to Plaintiff's grievances did not notify him of his option to file an appeal.[5]

Furthermore, Defendants have not provided any evidence of what information the kiosk provides regarding an appeal. For instance, instead of providing, as the Court requested, "information as to what the grievance form on the kiosk looks like," (doc. 47, p. 4), Defendants Nevil and Staten simply provide pictures of what the kiosk itself looks like, (doc. 49, pp. 15–17). The record is devoid of basic information including how an inmate could search for an appeal on the kiosk, what the kiosk tells inmates regarding an appeal, what the appeal form on the kiosk looks like, and what information an inmate is required to input to submit with his appeal. In essence, Defendants ask this Court to find that Plaintiff failed to comply with an appeal procedure without providing a copy of that procedure. This dearth of evidence is particularly

---

[5] Further, as Defendants point out, Plaintiff filed several grievances while at the Jail. However, he never filed any appeals. Particularly given his history of filing grievances, this lack of filing any appeals indicates that Plaintiff was not aware of the appeal process.

troubling given the fact that the Court provided Defendants with an opportunity to supplement the record on this issue.

Even if the Jail had a process for inmates to appeal the denial of grievances, that process was "essentially unknowable" to Plaintiff. Accordingly, the Court should **DENY** Defendants' Motion to Dismiss and consider Defendants' Motions on summary judgment grounds.

## II. Defendants' Motions for Summary Judgment

### A. Standard of Review

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, there must exist a conflict in substantial evidence to pose a jury question." Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." See Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be

unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).

### B.    Applicable Legal Standard

#### (1)    Kingsley and its Application

In Kingsley v. Hendrickson, the Supreme Court determined that a pretrial detainee alleging a violation of his constitutional rights must show, under the Fourteenth Amendment's due process clause, that an officer's actions in an excessive use of force claim were objectively unreasonable.  ___ U.S. at ___, 135 S. Ct. 2466, 2472–73 (June 22, 2015).  In other words, a pretrial detainee need not prove what a defendant's state of mind was at the time of the alleged constitutional violation, i.e., the subjective component in a typical Eighth Amendment excessive use of force claim alleged by a convicted prisoner.  Id.  The Court cautioned "[a] court (judge or jury) cannot apply this standard mechanically."  Id. at ___, 135 S. Ct. at 2473 (citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 850 (1998)).  "Rather, objective reasonableness turns on the 'facts and circumstances of each particular case.'"  Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

In light of the Kingsley decision, several courts have discussed its application to claims made by pretrial detainees involving deliberate indifference allegations.  See, e.g., Darnell v. Pineiro, ___F.3d___, Docket No. 15-2870, 2017 WL 676521 (2d Cir. Feb. 21, 2107).  However, it does not appear that Kingsley provides the standard which is to be applied in this case.  The

Eleventh Circuit has yet to issue a ruling on the proper standard to employ in analyzing a pretrial detainee's deliberate indifference claim in light of the Kingsley decision. Because of this, the Court applies the standards in place at the time giving rise to the events set forth in Plaintiff's Complaint. See Jacoby v. Baldwin Cty., ___ F. App'x ___, No. 14-12773, 2016 WL 6575054 (11th Cir. Nov. 7, 2016) (not applying Kingsley in qualified immunity analysis because the events giving rise to the claim occurred before Kingsley was decided); Thomley v. Bennett, 5:14-cv-73, 2016 WL 498436, at *7 n.7 (S.D. Ga. Feb. 8, 2016).

Furthermore, the record before the Court indicates that the events specifically giving rise to Plaintiff's Complaint occurred after he had been convicted. On January 6, 2015, Plaintiff was transferred to Bulloch County Jail from Calhoun State Prison. (Doc. 34-1, pp. 4, 37.) He completed his time for Calhoun State Prison on January 14, 2015, but was detained pending his criminal charges in the Superior Court of Bulloch County, Georgia. (Id. at p. 37.)[6] Plaintiff was convicted of those charges and sentenced on January 28, 2015. (Id.) Thus, from the period of January 14 to 28, 2015, Plaintiff was a pre-trial detainee. However, the record indicates that Plaintiff stopped receiving his medication on January 31, 2015, several days after he had already been convicted in the Superior Court of Bulloch County. (Doc. 1, p. 6; Doc. 36-1, p. 11; Doc. 36-2, pp. 3–4, 30–31, 75.) Thus, during the events in question, Plaintiff was considered a convicted felon, and consequently, the Cruel and Unusual Punishment Clause of the Eighth Amendment governs Plaintiff's case.

---

[6] The Jail erroneously entered the date in the Inmate Information Sheet as January 14, 2014.

**(2)     Legal Standards at the Time of Events Giving Rise to Plaintiff's Complaint**

The Eighth Amendment's proscription against cruel and unusual punishment imposes a constitutional duty upon prison officials to take reasonable measures to guarantee the safety of prison inmates.  This duty to safeguard also embodies the principle expressed by the Court in Estelle v. Gamble, 429 U.S. 97, 104 (1976), forbidding prison officials from demonstrating deliberate indifference to the serious medical needs of inmates.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  However, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Estelle, 429 U.S. at 105).  Rather, "an inmate must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994).

To prevail on a deliberate indifference claim, a prisoner must demonstrate "(1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010).  A medical need is serious if it "'has been diagnosed by a physician as *mandating* treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007) (quoting Hill, 40 F.3d at 1187) (emphasis supplied).  As for the subjective component, the Eleventh Circuit has consistently required that "a defendant know of and disregard an excessive risk to an inmate's health and safety."  Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995).  Under the subjective prong, an inmate "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence."  Goebert, 510 F.3d at 1327.

"The meaning of 'more than gross negligence' is not self-evident[.]" Id. In instances where a deliberate indifference claim turns on a delay in treatment rather than the type of medical care received, the factors considered are: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Id. "When the claim turns on the quality of the treatment provided, there is no constitutional violation as long as the medical care provided to the inmate is 'minimally adequate.'" Blanchard v. White Cty. Det. Center Staff, 262 F. App'x 959, 964 (11th Cir. 2008) (quoting Harris, 941 F.2d at 1504). "Deliberate indifference is not established where an inmate received care but desired different modes of treatment." Id.

"A medical treatment claim will not lie against non-medical personnel unless they were personally involved in the denial of treatment or deliberately interfered with prison doctors' treatment. Prison officials are entitled to rely on the opinions, judgment and expertise of a prison medical staff to determine a medically necessary and appropriate cause of treatment for an inmate." Baker v. Pavlakovic, No. 4:12-CV-03958-RDP, 2015 WL 4756295, at *7 (N.D. Ala. Aug. 11, 2015) (citing Williams v. Limestone Cty., Ala., 198 F. App'x 893, 897 (11th Cir. 2006)). "[It] is widely held that non-medical prison personnel are generally entitled to rely on the expertise of the medical staff and are not required to second-guess the medical staff's judgment regarding an inmate's care." Stallworth v. Graham, No. 4:14-CV-00134-RDP, 2015 WL 4756348, at *5 (N.D. Ala. Aug. 11, 2015) (citing Johnson v. Doughty, 433 F.3d 1001, 1011 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals[.]"), and Kelly v. Ambroski, 97 F. Supp. 3d 1320, 1343 (N.D. Ala. 2015) ("[I]n the absence of a reason to believe, or actual knowledge, that medical

staff is administering inadequate medical care, non-medical prison personnel are not chargeable with the Eighth Amendment scienter requirement of deliberate indifference[.]")).

### C.    Defendants Nevil and Staten

Defendants Nevil and Staten[7] argue in their Motion that they were not deliberately indifferent to Plaintiff's serious medical needs.  Furthermore, Defendants contend that they did not institute a custom or policy that resulted in deliberate indifference to Plaintiff's medical needs.  (Doc. 34-2, p. 8.)

### (1)    Seriousness of the Medical Need

The seriousness of Plaintiff's medical need is obvious in this case.  Plaintiff is HIV positive, and his condition was noted in his Inmate Information, Intrasystem Transfer Form, and the Receiving Screening.  (Doc. 36-2, pp. 3, 4, 24.)  Multiple documents indicate that Plaintiff took daily medication to treat his condition.  (Id. at pp. 30-31.)  Under the test required in Goebert, Plaintiff's condition is such that even a lay person would recognize it as needing treatment.  However, even if that were not the case, Plaintiff's condition was in fact diagnosed by a physician as mandating treatment.  Defendant Driggers, a nurse at the Jail, states that she sent Plaintiff to the Bulloch Wellness Clinic (or "the Clinic") on January 27, 2015, in an attempt to obtain medication for Plaintiff after his supply from Calhoun State Prison ran out.  (Id. at pp. 8, 37.)  Furthermore, Defendant Driggers spoke with Defendant Staten regarding Plaintiff's need for antiviral medication.  (Id. at p. 10.)  Thus, it is readily apparent, both by a layperson and by medical diagnosis, that Plaintiff had a serious medical need.

---

[7] For purposes of this Section C, Defendants Nevil and Staten shall be referred to as "Defendants."

### (2)    Deliberate Indifference to Plaintiff's Medical Need

As stated earlier, to satisfy the subjective deliberate indifference prong, Plaintiff must show that Defendants had knowledge of a risk of serious harm and disregarded that risk by conduct that is more than gross negligence. <u>Goebert</u> 510 F.3d at 1327. Furthermore, because Defendants are non-medical personnel, Defendants must have been "personally involved in the denial of treatment or deliberately interfered with prison doctors' treatment." <u>Baker</u>, 2015 WL 4756295, at *7. Defendants contend that they "were completely unaware of Plaintiff's medical condition or prescription," and that, even if they were aware of Plaintiff's medical needs, they did not disregard that risk with more than gross negligence. (Doc. 34-2, p.16.)

### a.    Defendant Nevil

Plaintiff provides Nurse Mock's response to his grievance that the Jail must "have approval through Captain Staten, and unfortunately the county is not going to approve this[,]" as evidence that Defendant Nevil knew of Plaintiff's medical need. (Doc. 42-3, p. 17.) However, Nurse Mock's response, standing alone, is insufficient to create a dispute of material fact as to whether Defendant Nevil was aware of Plaintiff's condition and lack of medication. As Defendants argue, Nurse Mock's response fails to support Plaintiff's contention that Defendant Nevil was actually aware of Plaintiff's condition. (Doc. 34-2, p. 16.) Accordingly, the record is devoid of any evidence that Defendant Nevil knew of Plaintiff's medical condition and requests for medication.[8]

---

[8] Furthermore, Plaintiff fails to set forth evidence that Defendant Nevil and Bulloch County had a custom or policy in place to deny him medication. In fact, Defendant Nevil asserts in his affidavit that "[a]lthough the Board sets the total budget for the Sheriff's Department, the Board cannot dictate how the Sheriff expends the budget in the exercise of his . . . exclusive authority and duty to administer the Bulloch County Jail." (Doc. 34-1, p. 10.) Furthermore, Defendant Nevil affirms that, during his tenure as Chairman of the Bulloch County Board of Commissioners, "the Board has never denied, based solely on cost or expense, a request from the Sheriff or the Sheriff's Department related to the medical treatment of an inmate housed at the Jail." (<u>Id.</u>)

### b.    Defendant Staten

However, the record before the Court indicates that Defendant Staten was notified of Plaintiff's medical condition and needs.   In addition to Nurse Mock's response, Defendant Driggers affirms in her affidavit that Plaintiff's medication required approval from the Jail administration, and that Captain Staten was the Jail administrator responsible for such approvals. (Doc. 36-2, pp. 9–10.)   Consequently, Defendant Staten's role in approving such medical requests puts him in such a position to be "personally involved" in approving or denying treatment to Plaintiff.  Baker, 2015 WL 4756295, at *7.  Furthermore, Defendant Driggers attests that she had a meeting with Defendant Staten in February 2015 specifically "regarding Plaintiff Shannon Horne's Atripla medication and the status of approval of the non-formulary request." (Id. at p. 10.)  Thus, at a minimum, there is a dispute of material fact as to whether Defendant Staten was aware of and disregarded any risk to Plaintiff's medical condition.

Furthermore, at this stage of the litigation, it appears Defendant Staten acted with more than gross negligence in disregarding Plaintiff's medical needs.   Defendant Staten argues that Plaintiff being sent to an outside medical facility is evidence to the contrary.   However, Plaintiff was sent to the Bulloch Wellness Clinic prior to running out of his supply of antiviral medication.   Yet, even after the Clinic confirmed Plaintiff's HIV positive status, Plaintiff was unable to receive his medication after he exhausted the supply Calhoun State Prison provided. The record indicates that Defendant Staten did not approve the medication because it was "expensive" and because Plaintiff would be "transferred back into state custody."  (Doc. 36-2, pp. 10, 73–74.)  Thus, at this stage of the proceedings, there is also a dispute of material fact as to whether Defendant Staten acted with more than gross negligence in disregarding any potential risk to Plaintiff's health by refusing to provide him with antiviral medication based on cost.  See

<u>Fields v. Corizon Health</u>, 490 F. App'x 174, 178 (11th Cir. 2012) ("[C]ost is not a factor which can justify the lack of timely medical treatment for [a serious medical need]."); <u>Wimberly v. Broome</u>, No. 6:15-cv-23, 2016 WL 3365684, at *3 (S.D. Ga. June 16, 2016) (Defendant "Broome's [ ] alleged cost-based refusal to follow the [Augusta State Medical Prison] orthopedist's prescription for Plaintiff to have an urgent operation constitutes deliberate indifference.").[9]

### (3)    Causation

Defendants also argue that there is no evidence that Plaintiff suffered any "detrimental effect arising from" their purported conduct.  (Doc. 34-2, p. 18.)  However, Plaintiff alleges in his Complaint that, as a result of not taking his antiviral medication for over twenty days, his viral load increased from undetected to 341.  (Doc. 1, p. 6–7.)  In support of this allegation, Plaintiff includes a copy of his medical history as part of his Response to the Motions for Summary Judgment.  (Doc. 42, p. 33.)  Included within that report are notations of Plaintiff's report to medical staff that he suffered night sweats, vomiting, and diarrhea.  (<u>Id.</u>)  Accordingly, at this stage of the litigation, it appears that Plaintiff was directly injured by Defendants' failure to provide Plaintiff with his necessary antiviral medication.

For all the aforementioned reasons, the Court should **GRANT IN PART** and **DENY IN PART** Defendants' Motion for Summary Judgment.  Specifically, the Court should **GRANT** the

---

[9]  Defendants attempt to analogize the facts in this case with a variety of other cases where defendants were not found to be deliberately indifferent in treating HIV prisoners.  However, those factual parallels fail because, unlike the prisoners in <u>Harris v. Thigpen</u>, Plaintiff did not receive any medication at all once his supply from Calhoun State Prison was depleted.  941 F.2d 1495, 1506–07 (11th Cir. 1991) (Affected prisoners received "a wide variety of antibiotics and medications.").  Additionally, Plaintiff's HIV positive condition was noted immediately upon intake, unlike the plaintiff in <u>McDaniels v. Lee</u>, 405 F. App'x 456 (11th Cir. 2010).  The Court finds the facts in the record of this case to be similar to <u>Brown v. Johnson</u>, which Defendants attempt to distinguish.  387 F.3d 1344, 1351 (11th Cir. 2004).  Plaintiff here had been prescribed medication and was taking it daily until his supply ended.  Once that occurred, Jail officials refused to continue his prescribed course of treatment.

portion of the Motion as to Defendant Nevil but **DENY** the portion of Defendants' Motion for Summary Judgment as to Defendant Staten.

### D. Defendant Driggers

In contrast, the record indicates that Defendant Driggers was not deliberately indifferent to Plaintiff's medical needs. Defendant Driggers served as a nurse for TransformHealthCS, the contract healthcare services provider at Bulloch County Jail. (Doc. 36-2, p. 6.) In response to Plaintiff's allegations that Defendant Driggers knew of Plaintiff's condition and failed to provide medical care, Defendant Driggers provides evidence that she attempted to secure additional medication for Plaintiff on several occasions. Because of the cost of Plaintiff's antiviral medication, Defendant Driggers could not order Plaintiff's medication without Jail administration approval. (Id. at pp. 9–10, 53–65.) In the face of this restriction, Defendant Driggers attempted to obtain antiviral medication from the Bulloch Wellness Clinic on February 2, 2015. (Id. at p. 10, 40.) In February 2015, Defendant Driggers also spoke with Captain Staten regarding Plaintiff's need for the medication and status of approval. (Id. at p. 10.) Additionally, after Plaintiff was no longer receiving his antiviral medication and requested medical care because he was feeling unwell, Defendant Driggers saw Plaintiff on February 9, 2015. However, Plaintiff rejected medical treatment after indicating he was feeling better. (Id. at p. 77.)

Based on the above facts from the record and in light of the restrictions in place, Defendant Driggers provided more than just "minimally adequate" medical care in treating Plaintiff's medical condition. Blanchard, 262 F. App'x at 964. Accordingly, the Court should **GRANT** Defendant Driggers' Motion for Summary Judgment and **DISMISS** Plaintiff's claims against Defendant Driggers.

**III.    Leave to Appeal *in Forma Pauperis* as to Defendants Nevil and Driggers**

Should the Court adopt this Report as the opinion of the Court, the Court should also deny Plaintiff leave to appeal *in forma pauperis* as to the Court's granting Defendants' Nevil and Driggers' Motions for Summary Judgment.  Though Plaintiff has, of course, not yet filed a notice of appeal, it would be appropriate to address these issues in the Court's order of dismissal.  See Fed. R. App. R. 24(a)(1)(A) ("A party who was permitted to proceed *in forma pauperis* in the district-court action, . . ., may proceed on appeal *in forma pauperis* without further authorization, unless the district court—before or after the notice of appeal is filed—certifies that the appeal is not taken in good faith[.]") (italics supplied).  An appeal cannot be taken *in forma pauperis* if the trial court certifies, either before or after the notice of appeal is filed, that the appeal is not taken in good faith.  28 U.S.C. § 1915(a)(3).  Good faith in this context must be judged by an objective standard.  Busch v. Cty. of Volusia, 189 F.R.D. 687, 691 (M.D. Fla. 1999).  A party does not proceed in good faith when he seeks to advance a frivolous claim or argument.  See Coppedge v. United States, 369 U.S. 438, 445 (1962).  A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless.  Neitzke v. Williams, 490 U.S. 319, 327 (1989); Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993).  Stated another way, an *in forma pauperis* action is frivolous and, thus, not brought in good faith, if it is "without arguable merit either in law or fact."  Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002); see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Based on the above analysis of Defendants' Nevil and Driggers' Motions for Summary Judgment, the Court should **DENY** Plaintiff's potential *in forma pauperis* status on appeal, as there are no non-frivolous issues to raise, and any appeal would not be taken in good faith.

## CONCLUSION

Based on the foregoing, I **RECOMMEND** that the Court **DENY** Defendants' Motions to Dismiss. (Docs. 34, 36.) Additionally, I **RECOMMEND** that the Court **GRANT IN PART** and **DENY IN PART** Defendants' Nevil and Staten's Motion for Summary Judgment. (Doc. 34.) Specifically, the Court should **GRANT** the portion of the Motion for Summary Judgment as to Defendant Nevil and **DENY** the portion as to Defendant Staten. Furthermore, I **RECOMMEND** that the Court **GRANT** Defendant Driggers' Motion for Summary Judgment and **DISMISS** Plaintiff's claims against Defendant Driggers. (Doc. 36.) Finally, I **RECOMMEND** that the Court **DENY** Plaintiff leave to appeal *in forma pauperis* the Court's granting of Defendant Driggers' and Defendant Nevil's Motions for Summary Judgment.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within fourteen (14) days of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the Complaint must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A

party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge. The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon the parties.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 7th day of March, 2017.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA